IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ROLAND A. THOMPSON #278801
          Petitioner            :

          v..                   :   CIVIL ACTION NO. CCB-02-2002

PATRICK CONROY, WARDEN and      :
THE ATTORNEY GENERAL FOR THE
STATE OF MARYLAND            :
          Respondents

## MEMORANDUM

Now before the Court is the petition of Maryland prisoner Roland A. Thompson for habeas corpus relief (Paper No. 1), respondents' answer thereto (Paper No. 12), and petitioner's objection and reply to the answer. (Paper Nos. 13 and 18).[1]  After review of these papers, the court finds no need for an evidentiary hearing. *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts; see also* 28 U.S.C. Section 2254(e)(2).  For the reasons that follow, the petition will be dismissed and relief denied.

---

[1]     On July 31, 2003, this court denied petitioner's request for production of documents and denied and dismissed the petition for habeas corpus relief. Paper Nos. 19 and 20.  The United States Court of Appeals for the Fourth Circuit vacated that judgment and remanded the case to afford petitioner an opportunity to reply to respondent's answer after review of all exhibits.  Paper No. 25.  Petitioner has received the exhibits and an opportunity to respond (Paper Nos. 28 and 31), yet has failed to file a reply limited to the issues raised in the petition and response.  Instead, on March 20, 2006, he moved to amend his petition to reassert and refine seven grounds raised in the original petition and to raise two new ineffective assistance of counsel claims and two new claims of trial court error.  Paper No. 37.  He asks that the petition as amended be dismissed without prejudice to allow his return to state court to exhaust his new claims.  He also seeks a ruling that such dismissal will toll the one-year limitations period imposed by 28 U.S.C. § 2244(d).  *Id.*  His requests are denied.  The factual predicate for these new claims have existed since trial, yet the claims were not raised on direct appeal or in Petitioner's numerous attempts to obtain collateral post-conviction relief from the state courts over the course of a five year period. Further, none of the claims involve a new rule of constitutional law previously unavailable for argument. Moreover, granting dismissal without prejudice or staying this case to allow petitioner to exhaust his claims and permitting him leave to amend his petition at this late stage of the proceedings would permit petitioner to circumvent the federal habeas statute under 28 U.S.C. § 2244(b) and hinder the interests in finality and prompt adjudication by further delaying resolution of habeas claims originally filed in 2002.  *See Evans v. Smith*, 220 F.3d 306, 321-22 (4th Cir. 2000), *cert. denied*, 532 U.S. 925 (2001).  For these reasons, petitioner's eleventh hour motion shall be denied.

### Procedural History

On January 22, 1998, petitioner was indicted in the Circuit Court for Baltimore City for the shooting deaths of Edward Demski and Eric Melzer.[2]  In August, 1998, a jury convicted petitioner of second degree murder of both victims and two counts each of use of a handgun in the commission of a felony or violent crime and wearing, carrying and transporting a handgun.[3] (Exhibit 7 at 17-18).

On appeal, petitioner and co-defendant Hackney, through counsel, raised the following issues:

l.      Were appellants deprived of a fair trial by evidence and other indications that they were involved in criminal activity for which they were not on trial, and did the trial court err in overruling related objections and denying a motion for mistrial?

2.      Did the trial court err in overruling the defense objection to the State's improper opening statement?

3.      Did the trial court err in refusing to propound requested *voir dire* questions? and

4.      Did the trial court err in permitting the jury to view the videotaped testimony

---

[2]      The facts of the crime, summed up by the Maryland Court of Special Appeals, indicate that Baltimore City police were called to a shooting in Armistead Gardens just before midnight on November 25, 1997. There, they found Edward Demski seated in a truck, having sustained a lethal gunshot wound to the head.  An unloaded .45 caliber handgun was at his side.  Eric Melzer, shot eight times, was lying on a sidewalk.  He died from chest wounds.  Robert Fleek testified that he, Philip Saunders, Petitioner, and co-defendant Thoyt D. Hackney encountered the victims near a 7-11 store on Pulaski Highway.  Melzer showed the group a gun which he wanted to sell or exchange for cocaine.  The group then reassembled on Quantril Way in Armistead Gardens, with Demski driving a truck in which Melzer was a passenger.  Fleek, a drug dealer, then returned to the 7-11 to answer a page. He heard argument and gunshots from the area near the truck and saw Melzer running.  While Melzer fled, a man standing behind a tree shot him.  Thereafter, Fleek encountered Petitioner and Hackney, who appeared "stunned." Petitioner indicated that the decedents tried to rob them, and he "had to do what I had to do" by shooting them.  *See* Paper No. 12, Exhibit 11at 1-3.

[3]      On October 23, 1998, petitioner was sentenced to thirty years' incarceration in the murder of Demski with a concurrent twenty -year sentence for use of a handgun, and to a consecutive thirty-year term for the death of Melzer with a concurrent twenty-year term on the second handgun conviction.  (*Id.*, Exhibit 8 at 50-51).

of two witnesses during its deliberations?

(*Id.*, Exhibit 9 at 2).  The Court of Special Appeals affirmed the conviction on June 16, 1999.

(*Id.*, Exhibit 11).  A request for *certiorari* on the four issues raised on direct appeal subsequently

was denied by the Court of Appeals.  (*Id.*, Exhibits 12 and 13).

On June 19, 2000, petitioner sought state post-conviction relief alleging ineffective

assistance of counsel.[4]  Following a hearing, the post-conviction court granted petitioner's

request to file a belated motion for modification of sentence and review by a three-judge panel

but otherwise denied relief in an opinion dated December 15, 2000.  (*Id.*, Exhibits 14 and 17).

Petitioner's request for leave to appeal the post-conviction decision[5] was summarily denied by

the Maryland Court of Special Appeals on April 15, 2002.[6]  (*Id.*, Exhibit 19 at 1).

In this habeas corpus action, his first in federal court, petitioner asserts that:

l.      Trial counsel rendered ineffective assistance by failing to object to the

---

[4]      Specifically, petitioner alleged that trial counsel failed to: (1) request severance or a separate trial from co-defendant Hackney, pursuant to Md. Rule 4-253; (2) request an instruction on the limited admissibility of evidence introduced against petitioner's co-defendant; (3) object to the introduction of "other crimes" evidence as it related to Hackney, thus prejudicing petitioner; (4) renew her objection to a sleeping juror after the trial court failed to deal with the juror; (5) pursue and argue evidence favorable to petitioner, such as (a) evidence that Hackney referred to his co-defendant as a juvenile, and petitioner was not a juvenile; and (b) Hackney's reference to his "co-defendant," who could not be petitioner, as petitioner was not charged with the crime at the time Hackney made the statement; and  (6) file a motion for review of sentence and/or modification, as requested.  Petitioner also alleges that appellate counsel (7) failed to raise the issue of severance and  (8) failed to raise the issue concerning the sleeping juror.  Petitioner also complained that the trial court erred: (9) in failing to sever, permitting the introduction of prejudicial evidence against petitioner; and (10) in failing to disqualify and remove the sleeping juror.  Finally, petitioner contends that trial counsel's errors had a cumulative negative impact on the outcome of trial.

[5]      In the application for leave to appeal, petitioner alleged that defense counsel failed to (1) move for severance when the prosecutor introduced evidence against Hackney which would have been inadmissible against petitioner if he had been tried separately; and (2) bring out the fact that Hackney's confession to John Sharpe exculpated petitioner.  *Id.*, Exhibit 18 at 4 and 7.  He did not seek leave to appeal the post-conviction court's other rulings.

[6]      The mandate issued a month later.  *See* Exhibit 20.

introduction of other crimes evidence; and failing to move for a separate trial;

2.      Petitioner was denied an impartial jury because Juror #8 was asleep during the presentation of evidence, and the trial court did not excuse him; and

3       The trial court erred by

(a)     not holding separate trials;
(b)     allowing the introduction of other criminal activities to be presented; and
(c)     permitting the jury to view the videotaped testimony of two witnesses during deliberations and permitting a law clerk to remain in the jury room for a lengthy period.

(Paper No. 1, Informal Brief at 8-10).

## Threshold Considerations

### Statute of Limitations

Respondents do not contend -- and the court does not find -- that the petition is time-barred pursuant to 28 U.S.C. §2244(d).

### Exhaustion of State Remedies

Under *Rose v. Lundy*, 455 U.S. 509 (1982), before a petitioner may present a habeas corpus claim in  federal court, the claim must be exhausted at the state court level.  This exhaustion requirement is satisfied by seeking review of the claim in the highest state court with jurisdiction to consider the claim.  *See* 28 U.S.C. § 2254(b) and (c).  In Maryland, this may be accomplished by proceeding with certain claims on direct appeal (and thereafter seeking *certiorari* to the Court of Appeals) and with other claims by way of  a post-conviction petition followed by seeking leave to appeal in the Court of Special Appeals.  Here, petitioner no longer has any state direct appeal or collateral review remedies available to him with respect to the claims raised in this court; thus, his claim is considered exhausted for the purpose of federal

4

habeas corpus review.

## Procedural Default

Respondents contend that: part of Claim 1 concerning counsel's failure to move for a separate trial; Claim 2 concerning the sleeping juror; Claim 3(a) concerning the trial court's failure to hold separate trials; and Claim 3(b) concerning the trial court's failure to prevent the introduction of "other crimes" evidence cannot be considered here because they were not fully presented in the state courts.  This impediment to federal review of a petitioner's claims is known generally as the "procedural default doctrine." *See Harris v. Reed*, 489 U.S. 255 (1989); *Johnson v. Muncy*, 830 F.2d 508 (4th Cir. 1987).  The procedural default doctrine ensures that "state courts have had the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding." *Picard v. Connor*, 404 U.S. 270, 276 (1971).  In *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977), the Supreme Court held that consideration of a claim in a petition for habeas corpus can be barred by failure to comply with state procedural rules, unless the petitioner makes a showing of cause for the failure and prejudice resulting from the failure. In *Harris,* 489 U.S. at 267, the Court emphasized that a federal court has the responsibility to determine whether a state court in fact based its denial of relief on procedural grounds.  In *Teague v. Lane*, 489 U.S. 288, 299 (1989), however, the Court determined that the rule announced in *Harris v. Reed* assumes that a state court has had the opportunity to address a claim that is later raised in a federal habeas proceeding.  *See id.*  at 299.  Thus, claims which have never been presented in the state courts-- or claims which were not exhausted properly in the state courts--are procedurally defaulted if presentation of the claims in state court would be barred by state procedural rules.  *See Johnson v. Maryland*, 915 F.2d 892, 895 (4th Cir. 1990).

The court does not agree with respondents that the first claim was not fully presented; instead, it finds that petitioner simply did not articulate the claim clearly when seeking to appeal the denial of post-conviction relief.  Claim 3(b) is partially exhausted, at least with regard to "other crimes" evidence involving witness Anne Fleek.  As to testimony of other crimes evidence presented through witnesses Sharpe and Blair, the Court of Special Appeals on direct review found that petitioner's counsel did not object to the evidence at trial, thus failing to preserve the issue on appeal. Accordingly, the issue of "other crimes" evidence presented through the testimony of Sharpe and Blair is subject to procedural default.  The court further finds that Claim 2 and Claim 3(a), raised at the post-conviction hearing, were not included when petitioner sought leave to appeal, and likewise are subject to procedural default.

These findings, however do not end the analysis, because this court may consider procedurally defaulted claims on the merits if petitioner shows either (1) cause for the procedural default and actual prejudice arising out of the violation of federal law, *Wainwright,* 433 U.S. at 87, or (2) a resulting fundamental miscarriage of justice if the federal court does not consider the claims.  *See Gray v.  Netherland*, 518 U.S. 152, 160 (1996);  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

Petitioner has failed to establish cause and prejudice for procedural default.  Nonetheless, this court must still consider whether it should reach the merits of his claims in order to prevent a fundamental miscarriage of justice. *See Schlup v. Delo*, 513 U.S. 298, 299 (1995).  The miscarriage of justice standard is directly linked to innocence.  *Id***.** at 320.  Innocence is not an independent claim; rather, it is the "gateway" through which a petitioner must pass before a court may consider constitutional claims which are defaulted.  *Id*. at 320.  The miscarriage of justice

6

exception applies where a petitioner shows that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986); *Schlup*, 513 U.S. at 320.  To meet this standard petitioner must show it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt. *Id*. *Schlup* observes that:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare . . . To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence--whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical  evidence--that was not presented at trial**.** *Id*. at 865.

Petitioner has failed to present such evidence, and review of the record does not suggest that it exists.[7]  Petitioner has failed to overcome the procedural bar, and his procedurally defaulted claims are therefore foreclosed from federal habeas review.[8]

## Standard of Review

Because this Petition was filed after April 24, 1996, it is to be decided under amendments to the habeas corpus statutes contained in the Antiterrorism and Effective Death Penalty Act ("AEDPA").  *See Woodford v. Garceau*, 538 U.S. 202, 207 (2003); *Beck v. Angelone*, 261 F.3d 377, 380 n.3 (4th Cir. 2001).   AEDPA modified the federal court's role in habeas proceedings in order to prevent federal "retrials" and to ensure that state court convictions are given effect to the extent possible under law.  *See Bell v. Cone*, 535 U.S. 685, 693 (2002).  Pursuant to statute, a federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits:

---

[7]     Testimony by John Sharpe, co-defendant Hackney's cell mate, was not, as petitioner claims, exculpatory. Sharpe testified that Hackney told him that Hackney shot one of the victims, while his unnamed friend, whom he had known most of his life, shot the other victim in the back as the victim ran.  *See* Paper No. 12, Exhibit 4 at 29-30.

[8]     In any event, the post-conviction court's rulings concerning "other crimes" evidence appear reasonable and would be upheld here pursuant to 28 U.S.C. §2254(d).

1)      resulted in a decision that was contrary to, or involved an
        unreasonable application of, clearly established federal law, as
        determined by the Supreme Court of the United States; or

2)      resulted in a decision that was based on an unreasonable
        determination of the facts in light of the evidence presented in the
        State court proceeding.

28 U.S.C. § 2254(d).

A decision is "contrary to" Supreme Court precedent if "the state court applies a rule that

contradicts the governing law set forth in our cases." *Williams v. Taylor*, 529 U.S. 362, 405

(2000).[9] Here, the state court correctly identified *Strickland v. Washington*, 466 U.S. 668 (1984)

as the case governing the claim.  Section 2254(d) also requires federal courts to give great

deference to a state court's factual findings.  *See Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir.

2000).  Section 2254(e)(1) provides that a determination of a factual issue made by a state court

shall be presumed to be correct absent clear and convincing evidence to the contrary.  Petitioner

has the burden of rebutting the presumption of correctness.  A decision adjudicated on the merits

in a state court and based on a factual determination will not be overturned on factual grounds

unless objectively unreasonable in light of the evidence presented in the state court proceeding.

*See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

<u>**Analysis of Petitioner's Undefaulted Claims**</u>

---

[9]      Although § 2254(d) is a "highly deferential standard for evaluating state-court rulings," *Lindh v. Murphy*, 521 U.S. 320, 333, n.7 (1997), "which demands that state court decisions be given the benefit of the doubt," *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curiam*), a state court decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 U.S. at 412-413.  A state court decision is based on an "unreasonable application" of clearly established federal law when "the state court  identifies the correct  governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*  "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409-410; *see also Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003); *Booth-el v. Nuth*, 288 F.3d 571, 575 (4th Cir. 2002).

### Ineffective Assistance of Trial Counsel

To establish a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), a convicted defendant must demonstrate that counsel's performance (1) "fell below an objective standard of reasonableness," and (2) that counsel's deficient performance prejudiced the defendant. *Id*. at 688, 692. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id*. at 686. The ultimate focus of the *Strickland* inquiry is on the "fundamental fairness of the proceeding whose result is being challenged." *Id*. at 696.

In evaluating whether counsel's performance fell below an objective standard of reasonableness, a court must consider "whether counsel's assistance was reasonable considering all the circumstances." *Id*. at 688. In its analysis, a court must be "highly deferential," and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, a defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id*. at 689 (internal quotations omitted). A court must not use the benefit of hindsight to second-guess strategic decisions made by counsel unless they were unreasonable. *See id*. at 690.

With regard to the prejudice prong of *Strickland*, a defendant need not demonstrate that the outcome of the proceeding would have been different, but rather that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Even if counsel committed a professionally unreasonable error, relief can be granted only if "counsel's deficient performance renders the

result of the trial unreliable or the proceeding fundamentally unfair." *See Lockhart v. Fretwell*,

506 U.S. 364, 372 (1993).

Petitioner claims that counsel failed to object to the introduction of "other crimes"

evidence against co-defendant Hackney and others at trial, and failed to move to sever his trial

from Hackney's. The post conviction court exhaustively examined these allegations, and found

as follows:

> Petitioner argues the State introduced evidence against Petitioner's co-defendant, Hackney, which would have been inadmissible against Petitioner if he was tried separately. Petitioner points to several statements introduced during his trial which were prejudicial to Petitioner.
>
> (1) First, the testimony of John Sharpe who testified for the State that Thoyt Hackney admitted committing the crimes he was charged with, namely the shooting of one of the victims. Petitioner points to the statement "he said he approached the truck, pulled out a nine millimeter handgun and unloaded it on the guy." (Trial Transcript, August 14, 1998, page 30.) The State's Attorney on direct examination introduced this evidence. Mr. Sharpe testified about a conversation he had with Petitioner's co-defendant on Thanksgiving Day 1997 while they were both held in the Baltimore City Detention Center. The testimony was as follows:
>
>> SHARPE: And we had some small talk, about who I was and why I was there, and who he was and why he was there, and what part of town he was from, and what part of town I was from and he started telling me about the circumstances of his case.
>>
>> STATE: What did he say to you?
>>
>> SHARPE: He said that he was there for a double homicide and handgun charges, and that he recently come off a five-year bit. And I think he said he did approximately 28 months on that. And he just started explaining the details basically of his case to me.
>>
>> STATE: Well, what did that entail?
>>
>> SHARPE: Said he was over at Armistead Gardens with a buddy of his, and a guy he had known for the majority of his life, with another guy, approached him in a truck, and asked him was he interested in purchasing a gun.

10

And Mr. Hackney told me he didn't trust the guy, so he made the guy unload the gun before he'd approach the truck to check it out.

So the guy took the bullets out of the gun, put them in one hand, and put the pistol in the other to let him know the gun was empty. And he said, "Well, how do we know you guys aren't packing?

So they took their shirts, he told me, they lifted up their shirts to show them that they weren't packing any weapons. And he continued to tell me in actuality that they both had guns in the small of their back.

So he approached the truck, pulled out a nine millimeter handgun and unloaded it on the guy. He said after that, the other fellow got out of the truck, started to run. He said the guy that was with him shot him in the back with a .357. (See Trial Transcript, August 14, 1998, pages 29 line 5 - page 30 line 14).

There was no objection to the introduction of this evidence at trial by Petitioner's counsel.

(2) Sharpe testified on direct examination that Thoyt Hackney told Sharpe he was a drug dealer thereby eliciting "other crimes" evidence. In explaining when and where he met Mr. Hackney, Petitioner's co-defendant, Sharpe testified as follows:

SHARPE: Him and I were in cells side by side, and I noticed for about the first week that he was there, he slept a lot and missed a lot of meals.

One time coming back from a meal, I went in and he was kind of awake, and I asked him how he could sleep so much, you know, and that he was missing meals, and asked him was he sick. I thought maybe he was drug-sick or something. He said no, he wasn't drug sick, he didn't use drugs, that he dealt drugs.

MR. FONES: (attorney for co-defendant Hackney): Objection.

COURT: Overruled. (See Trial Transcript, August 14, 1998, page 28 line 19 - Page 29 line 2).

Petitioner's counsel did not object to the introduction of this evidence.

(3) Sharpe testified on direct examination Thoyt Hackney told him he had re-

cently come off a five-year bit thereby eliciting "other crimes" evidence.

> SHARPE: And we had some small talk, about who I was and why I was there, and who he was and why he was there, and what part of town he was from, and what part of town I was from and he started telling me about the circumstances of his case.

> STATE: What did he say to you?

> SHARPE: He said that he was there for a double homicide and handgun charges, and that he recently come off a five-year bit.  And I think he said he did approximately 28 months on that.  And he just started explaining the details basically of his case to me.  (See

> Trial Transcript, August 14, 1998, page 29 lines 5-16).

There was no objection by Petitioner's counsel to the introduction of this testimony.

(4) Leon Blair who testified for the State that during an encounter, co-defendant Thoyt Hackney threatened "I'll kill you like I shot Eric in the face."

> STATE: I want to direct your attention back to November 29, 1997. Did you have an encounter with someone named Thoyt Hackney?

> BLAIR: Yes.

> STATE: Do you know that person by any other name?

> BLAIR: Yeah.

> STATE: What's the other name?

> BLAIR: Sonny.

> STATE: How long have you known this person Sonny?

> BLAIR: For like, five, six years.

> STATE: Do you know a person by the name Eric Melzer?

> BLAIR: Yes.

> STATE: How long have you known Eric Melzer?

12

BLAIR: Three or four years.

STATE: Back to November 29, 1997, did you have an encounter with Sonny?

BLAIR: Yes.

STATE: During that encounter, did Sonny say anything to you?

BLAIR: Yes, he did.

STATE: What did he say to you?

BLAIR: He said, "I'll kill you like I shot Eric in his face."

STATE: The person you're referring to as Sonny, do you see that person in the courtroom here today?

BLAIR: Yes.

STATE: Can you point him out for us?  Which person are you indicating?

BLAIR: This boy right here.

STATE: Pointing to the defendant Thoyt Hackney, for the record....
(See Trial Transcript, August 17, 1998 page 84 line 8 - page 85 line 15).

There was no objection by Petitioner's counsel to the introduction of this testimony.

(5) Leon Blair who testified during cross-examination by co-defendant's counsel, Mr. Fones, that during an encounter, co-defendant Thoyt Hackney had assaulted him.  The testimony was as follows:

FONES: All right, Mr. Blair.  This encounter you had with Mr. Hackney was November 29, 1997, is that right?

BLAIR: Yes.

FONES: That date is a few days after a murder case which happened in Armistead Gardens, right?

BLAIR: Yes.

FONES: You knew that right?

BLAIR: Yes.

FONES: And in the fight, you lost, right?

BLAIR: Well, it wasn't a fight.  It was an assault.  He was fighting me.
I wasn't doing nothing to him.

FONES: Oh, well, so then he beat you up, is that your testimony?

BLAIR: Yes.  (See Trial Transcript, August 17, 1998 page 85 line 20 -
page 86 line 15).

There was no objection by Petitioner's counsel to this testimony.

Petitioner alleges that he was entitled to severance because some, if not all, of
the evidence would not have been mutually admissible at separate trials.  As to
the testimony by Sharpe and Blair as outlined above, Petitioner argues the state-
ments were admissible hearsay against Petitioner's co-defendant Hackney, as a
statement against interest.  Petitioner further argues, however, the statements
were inadmissible hearsay against him in a separate trial and that the statements
were prejudicial to Petitioner.  Therefore, Petitioner argues that he should have
been granted a severance.

Petitioner's defense counsel at trial, Ms. Beverly Salmon, testified at the Post
Conviction hearing before this Court on November 29, 2000 that she considered
requesting a severance at the time of the trial and filed the appropriate motion
within the Omnibus Motion filed by the Office of the Public Defender; however,
there was no attempt to actually sever the cases.  Ms. Salmon testified at the Post
Conviction Hearing that at the time of the trial she did not think the testimony
of both Blair and Sharpe was prejudicial to Petitioner in that her trial strategy was to
show that there were three other possible persons who could have murdered the
victims (i.e. Saunders, Fleek and, Petitioner's co-defendant, Hackney).

The credibility of the State's witnesses was pivotal to the outcome of the trial.
The evidence as to prior bad acts and prior convictions, as set forth in the testi-
mony above, in accordance with defense counsel's trial strategy, was necessary to
show that the co-defendant, Hackney, and Fleek and/or Saunders were "bad
people" and could have murdered the two victims supporting her argument that
Petitioner did not.  In fact, Ms. Salmon argued to the jury during closing argument
that, "Ladies and Gentlemen, Phillip Saunders should be on trial here and Robert
Fleek should be on trial here.  There is not one iota of credible evidence that could
convict Roland Thompson."  (See Trial Transcript, August 18, 1998, page 75 lines
22-25).  Clearly, Ms. Salmon's trial strategy was to not object to the introduction
of prejudicial evidence against Petitioner's co-defendant so that she could argue

reasonable doubt as to the guilt of her client.  As an experienced member of the bar, trial counsel's decisions were based on sound trial strategy, not a substandard performance.  The law provides that if trial counsel has a tactical reason for his action, a court may not deem the action deficient. [Citation omitted]....I find Ms. Salmon's trial strategy reasonable and I do not find it to be erroneous.  Therefore, I deny relief.

* * * *

Lastly, Petitioner alleges that by not requesting a severance Petitioner was subjected to prejudice when co-defendant's counsel, Mr. Fones, highlighted the evidence against the Petitioner and even misstated the evidence in order to shift the blame from the co-defendant to the Petitioner during closing argument.

> FONES: No one would tell you they even saw Sonny with a gun.  No one would ever tell you they saw Sonny do the shooting.  No one would ever tell you that they saw Sonny help, or aid, or counsel, or abet someone else to commit murder.  And that's what happened.  No eyewitnesses came in here.  No one who was there told you that.

> So I guess if you're going to believe the witnesses [the State] wants you to believe, that's Mr. Saunders and Mr. Fleek, whether or not you find Roland Thompson guilty of being the shooter because Mr. Saunders and Mr. Fleek give statements that Roland confessed to that, whether or not you believe them or not, and you think Roland Thompson is the shooter, they do not say that Mr. Hackney is guilty of murder. (See Trial Transcript, August 18, 1998, page 80 lines 4-19).

> ....

> [The State] did not talk about Mr. Blair, but I'm not quite sure why. But let's compare Mr. Blair then to Mr. Sharpe.  Citizen Number 1, Mr. Sharpe says, "No, Mr. Hackney confessed to me that he shot the other guy."

> Okay.  So here's the problem.  If you believe Mr. Fleek and you believe Mr. Saunders, you can't believe what they're telling you.  Mr. Fleek told you that what he saw was one person doing the shooting, here and then down there.  One person doing the shooting.

> And you know what?  Since Roland allegedly told him later that, "I shot the guy cause they were rob[bing] me, then the State must believe that the person who did the shooting, if you believe that guy, was Roland Thompson.  They can't have it both ways.

> Either the person who shot these men is Roland Thompson or it is Thoyt
> Hackney. Who is it? He doesn't know.
>
> That's not right. That's just not right. Bring in all these witnesses - it's
> like bringing in a dump truck full of dirt. Bring into the courtroom, dump-
> ing it right here, and let you all sort it out.
>
> That's not right. That's not justice. What should happen in a case that's
> this serious is the State needs to sort it out, determine in its own mind who's
> telling the truth before they bring him in here and put them all in front of
> you and just figure, I'll let the jury sort it out. That's not right! (See Trial
>
> Transcript, August 18, 1998, page 84 line 15 - page 85 line 18).

Petitioner's counsel did not object during the closing argument of co-defendant's
counsel.

Petitioner alleges this evidence would not have been admissible against the Petitioner
in a separate trial, and as a result Petitioner was subjected to substantial prejudice and
denied his right to a fair trial. Petitioner alleges that evidence against the co-defendant
was overwhelming and while this could be considered exculpatory to Petitioner, the
fact that Petitioner and Mr. Hackney were friends and were allegedly seen together
before and after the crime occurs raises the assumption that Petitioner may be guilty
due to the evidence introduced against co-defendant, Hackney. As such, Petitioner
alleges his counsel was further ineffective for not requesting a severance.

Furthermore, Petitioner alleges that during the closing rebuttal argument State's
Attorney Mabrey left the jury with the impression that Petitioner committed the
crime. Mr. Mabrey's closing argument was as follows:

> MABREY: Mr. Sharpe testifies that Sonny and Roland told him –
>
> MS. SALMON: Objection.
>
> MABREY:  – to unload the gun.
>
> COURT: Overruled.
>
> MABREY: What - how- what condition is the gun in the truck. It's
> unloaded. The clip is laying on the seat. The gun's down on the floor.
> Who else is going to know that besides the killers? (See Trial Transcript,
> August 18 1998, page 91 line 22 - page 92 line 6).

Following Mr. Mabrey's closing argument, trial counsel approached the bench.

Counsel for co-defendant Hackney and Ms. Salmon, trial counsel for Petitioner, each requested a mistrial, and furthermore, [Ms. Salmon] requested that if and in the event that the motion for mistrial be denied, that the Court give a curative instruction based upon Mr. Mabrey's argument....

\* \* \* \*

The Court denied the motion for mistrial and did not give a curative instruction. The Court stated:

> COURT: I think the arguments that were made here were not farfetched, were not arguments that were so outside the facts that were presented in the case that they would have a tendency to inflame, prejudice, mislead, or otherwise cause the jury to focus on something other than the evidence with which they have been presented in this case.

> And to the extent there was argument based on something that is not in evidence, again the jury has been told that it is argument not evidence.

> So I'm not going to instruct them again.  I think they've been properly instructed and sufficiently instructed, and to the extent that a motion has been made for mistrial, that is denied.  (See Trial Transcript, August 18, 1998, page 99 lines 4-18).

In fact [the] presiding trial judge, did previously correctly and thoroughly instruct the jury regarding opening and closing arguments. [The trial court] instructed the jury "opening statements and closing arguments of lawyers and not evidence in the case.  They are intended only to help you understand the evidence and apply the law.  Therefore, if your memory of the evidence differs from anything the lawyers tell you, or for that matter, anything I tell you, you must rely on your own memories of the evidence."  (See Trial Transcript, August 18, 1998 page 34 lines 16-23).

Petitioner has failed to show that trial counsel was deficient in any manner.  Mr. Fones said nothing in his closing argument which was prejudicial to the Petitioner. Essentially, Mr. Fones argued during his closing that the case against both defendants was not strong and that the State's witnesses were not to be believed. This clearly did not prejudice the Petitioner.  Furthermore, there was no prejudice to the Petitioner with regards to [the State's] closing argument.  In fact, Ms. Salmon did object to the rebuttal closing argument of [the State] and also requested a mistrial.  The Court properly overruled her objection and denied the motion for mistrial.  There is nothing more Ms. Salmon could have done, and there is absolutely no evidence [the trial court] abused his discretion.  The denial of a motion for mistrial will be reversed only if the defendant was so clearly prejudiced that the trial court's denied constituted an abuse of discretion. [Citation omitted].  The mere occurrence

of improper remarks does not by itself constitute reversible error. [Citation omitted]. The record does not support Petitioner's claim of prejudice, in light of the trial strategy.

* * * *

Petitioner alleges that the "other crimes" evidence introduced was highly preju- dicial to the Petitioner and that counsel was ineffective for not objecting to the "other crimes" evidence as discussed in this Post Conviction Memo Analysis Part 1 as follows:

> (1) Petitioner points to John Sharpe's testimony that Thoyt Hackeny told him he was a drug dealer....

> (2) John Sharpe's testimony that Thoyt Hackney told him he had recently come off a five-year bit....

> (3) Leon Blair's testimony that Thoyt Hackney threatened to shoot him in the face "like I shot Eric"....

> (4) Leon Blair's testimony that Thoyt Hackney has assaulted him....

At the Post Conviction hearing before this Court...Petitioner submitted that this "other crimes" argument merges into the severance arguments as discussed...above.

In addition, Petitioner alleges that in the prosecutor's opening statement, Mr. Mabrey told the jury that they will hear testimony that the victims were going to get cocaine from the defendants and Petitioner argues his defense counsel should have objected to this.  Petitioner argues this was prejudicial and referred to acts of misconduct for which both defendants were not charged....

The Court of Appeals had held that the trial court had broad discretion in con- trolling the scope of opening statements. [Citation omitted].  Petitioner does not assert the statement was either made in bad faith or was the result of prosecutorial misconduct.  Saunders testified on direct examination for the State that "they was trying to get some coke" (See Trial Transcript, August 14, 1998 page 173 lines 13-14) and they were told to "meet them on the hill."  (See Trial Transcript, August 14, 1998 page 173 line 20).  Furthermore, Robert Fleek testified on direct examina- tion by the State that the victims "wanted some coke" for the gun.  (See Trial Transcript, August 13, 1998 page 147 line 3)

(*See* Paper No. 12, Exhibit 17 at 6-20).

The state post-conviction court, as reflected in its thorough opinion, excerpted above,

18

carefully considered the petition and reached reasonable factual and legal conclusions, supported

by the record, with regard to Petitioner's claims of ineffective assistance of counsel.  Accord-

ingly, under the analysis set forth in *Bell v. Cone, supra,* relief will be denied, pursuant to 28

U.S.C. § 2254(d).

### Trial Court Error

Petitioner's contention of trial court error based on the admission of "other crimes" evi-

dence was raised on direct appeal.  As noted previously, the Court of Special Appeals found most

of the claims involving witness testimony concerning such evidence to be waived, due to coun-

sel's failure to object.  With regard to testimony by Anne Fleek, the appellate court ruled as fol-

lows:

> Appellants next argue that the trial court erroneously denied the mistrial motion
> and propounded an inadequate curative instruction, after striking the testimony of
> Anne Fleek.  Fleek had initially testified that Thompson had threatened to beat
> up and kill her brother, Robert Fleek.  The trial court admitted her testimony based
> on the prosecutor's proffer that Thompson's threat concerned "testifying or not
> testifying" in this case.  However, after Fleek testified that she "guessed" Thomp-
> son's threats related to the trial, but was not certain, the court instructed the jury
> to disregard her testimony.  The court stated the following: "Based on some
> technical requirements and evidence requirements under the law, I am going to
> ask you to please disregard Ms. Fleek's testimony.  Please disregard Ms. Fleek's
> testimony."

> The Maryland Court of Appeals had held "that the declaration of a mistrial is
> an extraordinary act which should only be granted if necessary to serve the
> ends of justice." [Citation omitted].  The decision to declare a mistrial rests
> within the sound discretion of the trial judge, who "has his finger on the pulse
> of the trial" and is in the best position to evaluate the need for such an extra-
> ordinary remedy. [Citation omitted].  The trial court's determination will not
> be disturbed on appeal absent a clear and egregious showing of prejudice to the
> defendant, and the burden is on the defendant to establish such prejudice.
> [Citation omitted].

> In the case *sub judice*, the trial court concluded that Fleek's testimony was not

sufficiently prejudicial to cause a mistrial.  The court struck Fleek's testimony
in its entirety.  Further, the trial court informed the jury during final instructions
that the stricken testimony was not evidence and repeated, "If, after an answer was
given, I ruled that the answer should be stricken, you must disregard both the
question and the answer in your deliberations."  The trial court did not err in
denying the motion for mistrial or giving an improper curative instruction.

(*See* Paper No. 12, Exhibit 11 at 10-11).

Petitioner also alleges that the trial court erred by permitting the jury to view the

videotaped testimony of two witnesses during deliberations while allowing a law clerk to remain

in the jury room during that time.  The Court of Special Appeals reviewed these allegations, and

found as follows:

During deliberations, the jury sent a note to the trial judge requesting to review
the testimony of Robert Fleek and John Sharpe.  The jury indicated that it had
"Conflicting notes and memories on some key points."  The court granted the
request and permitted the jury to review videotapes of the witnesses' complete
testimony, with the bench conferences eliminated.  The court's law clerk, who
had been instructed to remain silent throughout the review, operated the equip-
ment to replay the witnesses' testimony.

Appellants argue that the trial court erred in permitting the jury to review the
videotaped testimony of two State witnesses, because it improperly highlighted
their testimony.  Further, they contend that the trial judge erred by sending his
law clerk into the deliberation room for an extended period of time.  Appellants
contend that even "assuming that the judge's clerk obeyed the admonition to
remain silent, his facial expressions or body language during the replaying of
Fleek's and Sharpe's testimony may have influenced the jury."  Appellants
argue that the procedure adopted by the trial court violated their right to be
present at a critical stage of the trial.  We disagree.

A trial judge has wide discretion in the conduct of a trial, and we will not
disturb the exercise of that discretion unless it has been clearly abused. [Ci-
tation omitted].  Maryland Rule 4-326(b), governing a jury's request to review
evidence, states that following:

[t]he court, after notice to the parties, may make available to the
jury testimony or other evidence requested by it.  In order that
undue prominence not be given to the evidence requested, the court
may also make available additional evidence relating to the same

factual issue.

In the case *sub judice*, the trial court exercised its discretion to ensure that there was no unfair prejudice to appellants.  The trial court explained its decision before the videotapes were played.  He told the parties that he had "instructed the law clerk very specifically to show [the jury] only the testimony of those witnesses and, without hearing any comments at the bench during any bench conferences."  The judge had reviewed portions of the tapes that morning to confirm that only the appropriate testimony was included.  Noting that a video-tape was the medium by which the testimony had been recorded, the court explained the following:

> I have taken all of the precautionary measures I believe that need to be taken to make sure that [the jury doesn't] see anything other than the testimony that they asked for.
>
> I have instructed the clerk in no uncertain terms not to speak to them about anything.  He will not.  He will simply show the tapes, and that's that.

(*See* Paper No. 12, Exhibit 11 at 16-18).

Respondents cite *Bates v. Lee*, 308 F.3d 411, 418 (4th Cir. 2002) and *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) for the proposition that "[i]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."  There does not appear to be any denial of due process or fundamental miscarriage of justice with regard to the application of state law to the issues noted above.  Thus the state court findings regarding the trial court's actions, which are supported by the record and appear correct under state law, will be upheld, pursuant to §2254(d).

The petition is denied.  A separate Order will be entered in accordance with this Memorandum.

____March 29, 2006____                        _____/s/_____
Date                                                    Catherine C. Blake
                                                           United States District Judge